UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FORD MOTOR COMPANY,

          Plaintiff,                       Civil No. 2:06-13346

v.                                 DISTRICT JUDGE ARTHUR J. TARNOW
                                 MAGISTRATE JUDGE STEVEN D. PEPE

UNITED STATES CUSTOMS AND
BORDER PROTECTION,

          Defendant.

_____/

**REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. #28)**

       This is an action brought by Plaintiff, Ford Motor Company ("Ford"), under the Freedom

of Information Act ("FOIA"), 5 U.S.C. § 552, against the U.S. Customs and Border Protection

("Customs"), an agency of the U.S. Department of Homeland Security (Complaint ¶ 1).[1]  On

January 31, 2008, Customs filed its Motion for Summary Judgment on Count I of the Complaint

asserting that there exists no genuine issue of material fact regarding whether Customs has

fulfilled its disclosure obligation in response to Ford's FOIA requests (Dkt. #28).  Ford filed its

Response in opposition to Custom's Motion on March 18, 2008 (Dkt. #35).  All pre-trial matters

---

[1] Effective March 1, 2003, the U.S. Customs Service became part of the Border and
Transportation Security Directorate of the new U.S. Department of Homeland Security in the
form of three new agencies, the U.S. Customs and Border Protection ("Customs") and the U.S.
Immigration and Customs Enforcement ("ICE"), and the U.S. Citizenship and Immigration
Services ("USCIS").  This Report and Recommendation will refer to both the U.S. Customs
Service and the U.S. Customs and Border Protection as Customs.

were referred in accordance with the authority conferred under 28 U.S.C. § 636(b) (Dkt. #24).

For the reasons indicated below, **IT IS RECOMMENDED** that Custom's motion be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND FACTS

### A.    Ford's Freedom of Information Act (FOIA) Requests

By letters dated October 6, 2005, to (1) the Office of the Commissioner of Customs in Washington, D.C., (2) the Office of Chief Counsel at Customs in Washington, D.C., and (3) the Customs Regulatory Audit Division in Fort Mitchell, Kentucky ("RAD, Fort Mitchell"), Ford requested under the FOIA, "[a]ny documents from February 2002 to the present that relate in any way to the review of Ford's application to join the Importer Self-Assessment ("ISA") Program," as well as "[a]ll documents from January 2001 to the present that in any way relate to an assessment of or otherwise comment on the nature or quality of Ford's relationship with CBP or Ford's compliance with Customs laws and/or regulations" (Complaint, ¶ 40 and Exs. A-C).

Ford made the same FOIA request by letter dated October 6, 2005, to Customs Regulatory Audit Division in Washington, D.C., ("RAD, Headquarters") but also requested from that office "[a]ny documents relating in any way to CBP's classification of Ford as a 'low-risk importer' during its 1997-2000 Customs Assessment Team ("CAT") Audit," and any documents related to CBP's policies concerning the designation of "low risk" importers and letters to certain importers designated as "low-risk" (Complaint, ¶ 41 and Ex. D).

Although each of these FOIA requests indicated that a similar request was being sent to the Regulatory Audit Division in Detroit, Michigan ("RAD, Detroit"), no such request was

received there, and Ford does not allege in its Complaint that a FOIA request ever was sent to RAD, Detroit.

**B.  Custom's Response To Ford's FOIA Requests**

By letter dated November 4, 2005, Joseph Rees, then Director of Importer Self Assessment in the Office of Strategic Trade, acknowledged Ford's FOIA requests (Complaint, ¶ 44 and Ex. G; Dkt. #28, Ex. 1, Declaration of Joseph Rees ("Rees Decl.") at ¶¶ 3-4).  Rees was assigned to coordinate the search for and review of responsive documents at RAD, Headquarters; RAD, Fort Mitchell; and the Office of the Commissioner.  Rees conducted the search for responsive documents at RAD, Headquarters, and asked personnel at RAD, Fort Mitchell to gather and forward to him all documents they had that were related to the ISA review (Dkt. #28, Ex. 1, Rees Decl. at ¶ 3).  Although no FOIA request was sent to RAD, Detroit, because the RAD, Headquarters request sought documents relating to the classification of Ford as a "low-risk importer" during the 1997-2000 CAT audit, and that audit was conducted by RAD, Detroit, Rees requested that RAD, Detroit, review those records for responsiveness and determine what, if any, redactions needed to be made (*id.* at ¶¶ 11-12).

By letter dated December 6, 2005, Ford filed an administrative appeal with Customs' FOIA Appeals, Policy and Litigation Branch ("FAPL"), asserting that it had not received a response to its FOIA requests (Complaint, ¶ 46 and Ex H).  On January 6, 2006, the FAPL attorney assigned to handle the appeal spoke with, and forwarded the appeal letter to, Joseph Rees, who continued to coordinate the responses to the RAD, Headquarters, RAD, Fort Mitchell, and Office of the Commissioner FOIA requests (Dkt. #28, Ex. 1, Rees Decl. at ¶ 10; Ex. 2,

Superseding Declaration of Shari Suzuki ("Suzuki Decl.") at ¶¶ 9, 11). By letter dated January 9, 2006, FAPL Appeals Officer Shari Suzuki acknowledged receipt of the appeal letter and advised counsel for Ford that the matter had been assigned to a member of her staff (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 10).

In late January 2006, Rees prepared a response to Ford concerning the initial processing of the FOIA requests sent to RAD, Headquarters, RAD, Fort Mitchell, and the Office of the Commissioner (Dkt. #28, Ex. 1, Rees Decl. at ¶ 13). In that letter, Rees informed Ford that RAD, Detroit, needed approximately six weeks to complete their review of the CAT documents to determine if documents could be released in response to the FOIA request (*id*). Rees also noted in that letter that Ford had received a copy of the CAT 911-97-IMO-002 report in 2000, after it was completed (*id.*). The FAPL attorney assigned to Ford's appeal learned on or about March 13, 2006, that Ford never received this letter (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 14). Thus, the FAPL attorney obtained the letter from Rees and sent it via fax to counsel for Ford on March 15, 2006 (*id.* at ¶ 16). The FAPL attorney then contacted Rees and requested that all potentially responsive documents from the three RAD offices (Headquarters, Detroit, Fort Mitchell) be forwarded to the FAPL Branch for inclusion in that office's processing of Ford's FOIA appeal (*id.*).

Although Rees had requested that RAD, Detroit search for and send him responsive documents, at the time the FAPL attorney asked him to forward all potentially responsive documents, he had not yet received any from RAD, Detroit (Dkt. #28, Ex. 1, Rees Decl. at ¶ 16). Thus, the FAPL attorney requested that all documents related to CAT 911-97-IMO-002 be

forwarded to the FAPL Branch (Dkt. #28, Ex. 3, Declaration of Glennys Ford ("Ford Decl.") at ¶ 4; Ex. 2, Suzuki Decl. at ¶ 16; Ex. 1, Rees Decl. at ¶ 16). Before RAD, Detroit, responded to that request, however, the Office of Chief Counsel in Washington, D.C. requested that all files related to CAT 911-97-IMO-002 be forwarded to that office (Dkt. #28, Ex. 3, Ford Decl. at ¶ 5; Ex. 2, Suzuki Decl. at ¶ 17; Ex. 1, Rees Decl. at ¶ 17). Without conducting a review for responsiveness or to determine if information should be redacted from the documents, RAD, Detroit placed all of the CAT 911-97-IMO-002 files in boxes and sent them to the Office of Chief Counsel (Dkt. #28, Ex. 3, Ford Decl. at ¶ 6; Ex. 2, Suzuki Decl. at ¶ 17). The Office of Chief Counsel forwarded the boxes to FAPL without opening or reviewing the contents (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 17). Rees forwarded to FAPL the potentially responsive RAD, Fort Mitchell documents (contained on a CD ROM) and the documents he had located at RAD, Headquarters (Dkt. #28, Ex. 1, Rees Decl. at ¶ 18; Ex. 2, Suzuki Decl. at ¶ 20).

The FAPL Branch conducted an initial item by item, page by page, review of the documents and disks received from RAD, Detroit and from Rees (Dkt. #28, Ex. 2, Suzuki Decl. at ¶¶ 19-20). Some documents were released in full or in part to Ford (*id.* at ¶¶ 21, 23, 29-31). Documents that were deemed responsive, but subject to withholding in full or in part under the FOIA, are accounted for in the *Vaughn* indexes attached to the Superseding Suzuki Declaration as Exhibits A & B (Dkt. #28, Ex. 2, Suzuki Decl.).[2] During processing of the appeal, FAPL learned of potentially responsive records kept at the

---

[2] Because all documents received from RAD, Headquarters were either not responsive or duplicative of RAD, Fort Mitchell documents, no documents from RAD, Headquarters are listed on the *Vaughn* indexes attached to the declaration.

Penalties Branch of the Office of Regulations and Rulings ("OR&R") (*id.* at ¶ 26). Although the Penalties Branch was not an office included in the FOIA requests, FAPL conducted a search and review of Penalties Branch records (*id.*). That search produced some records that have been withheld in full and are identified in the *Vaughn* index attached to the Superseding Suzuki Declaration as Exhibit B.

Suzuki directed her staff attorney to request that Ford narrow the scope of the aspect of the FOIA requests that asked for "[a]ll documents from January 2001 to the present that in any way relate to an assessment of or otherwise comment on the nature or quality of Ford's relationship with CBP or Ford's compliance with Customs laws and/or regulations" (*id.* at ¶22). The staff attorney contacted counsel for Plaintiff by telephone several times to seek narrowing of the request (*id.*). The response was a telephone message from counsel to consider the text of the request "as is" (*id.*). By letter to Ford dated June 30, 2006, Suzuki confirmed that Ford had declined Customs' request to narrow the scope of its request and informed Ford that Customs had remanded that portion of Ford's FOIA requests to the Office of Chief Counsel (*id.* at ¶ 24).

Meanwhile, on March 22, 2006, CBP's Office of Chief Counsel learned from FAPL that Ford had filed a FOIA appeal of, among others, the FOIA request sent to the Office of Chief Counsel (Dkt. #28, Ex. 4, Superseding Declaration of Scott Falk ("Falk Decl.") at ¶¶ 7-8). Although Federal Express records show that the FOIA request was received in the mailroom in Customs on October 7, 2005, it never was received in the Office of Chief Counsel and so never

was processed.[3] (*id*. at ¶ 7).  The Office of Chief Counsel advised FAPL that it never received

the FOIA request, and FAPL requested that the Office of Chief Counsel conduct a search and

return all responsive documents to FAPL to be included in the response to the appeal (*id.* at ¶ 9).

The Office of Chief Counsel attorney who processed this FOIA requested that FAPL

clarify Ford's request for "[a]ll documents from January 2001 to the present that in any way

relate to an assessment of or otherwise comment on the nature or quality of Ford's relationship

with CBP or Ford's compliance with Customs laws and/or regulations" because the request was

unduly broad (*id.* at ¶ 10).  The attorney learned that a narrowing request had been made and

denied (*id*. at ¶ 11).  In light of the complexity of that aspect of Ford's FOIA requests, and the

fact that the Office of Chief Counsel would be most familiar with where potentially responsive

documents could be found and any FOIA exemptions that might apply, that aspect of all of

Ford's FOIA requests was remanded to the Office of Chief Counsel for initial processing (*id*. at ¶

12; Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 24-25).

On July 25, 2006, Ford filed the present case.  In September 2006, Customs' counsel

requested that Ford narrow the portion of its FOIA request referenced above (Dkt. #28, Ex. 4,

Falk Decl. at ¶ 14 and Ex. G).  Ford responded that Customs was interpreting the request in an

overly-broad manner, and did not provide clarification or narrow the request (*id.*).  In light of

Ford's assertion that Customs was interpreting its request too broadly, the Office of Chief

Counsel attorney who was processing the FOIA reconsidered the scope of that request (*id.* at ¶

---

[3] No one was employed by the Office of Chief Counsel at that time, or subsequently was employed by the Office of Chief Counsel, with a name that matches the name on the Federal Express delivery log (Dkt. #28, Ex. 4, Falk Decl. at ¶ 7).

15).  The attorney determined that a reasonable interpretation was that Ford was asking for

internal agency communications assessing or commenting on the nature or quality of Ford's

relationship with the agency from January 2001 to the processing of the FOIA request, and

internal agency communications assessing or commenting on Ford's compliance with customs

laws and regulations from January 2001 to the processing of the FOIA request (*id.*).  Following

the search for documents based on this interpretation, seventeen pages were released with

redactions to Ford on September 20, 2006, along with a letter setting forth the agency's

interpretation of Ford's request and requesting clarification if Ford did not agree with the

interpretation (Dkt. #28, Ex. 4, Falk Decl. at ¶ 16 and Ex. H).  Ford did not reply to the agency or

otherwise contest the stated interpretation (*id.* at ¶ 16).  Documents that were deemed responsive

to the request as interpreted by the Office of Chief Counsel and nonduplicative, but subject to

withholding in full or in part under the FOIA, are accounted for in the *Vaughn* indexes attached

to the Superseding Falk Declaration as Exhibits A & B (*id.* at ¶¶ 3, 18).

In January 2007, the Office of the Commissioner was specifically searched for responsive

documents as part of FAPL's handling of the FOIA appeal.  There were no responsive

documents

found (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 28).

On July 27, 2007, following a status conference in this case on July 16, 2007, Defendant

submitted declarations from Shari Suzuki and Scott Falk, along with *Vaughn* indexes,

documenting the search for responsive documents and identifying documents withheld in full or

in part under various FOIA exemptions (Dkt. #18 & 19).[4]  After Ford complained that, among

other things, the *Vaughn* indexes were inadequate, FAPL and the Office of Chief Counsel both

conducted further review of the documents withheld in full or in part (Dkt. #28, Ex. 2, Suzuki

Decl. at ¶ 30; Ex. 4, Falk Decl. at ¶ 22).   On January 30, 2008, Customs filed the present Motion

for Summary Judgment attaching four declarations, two of which were revised.  Specifically,

Customs, attached to its motion the revised declarations of Scott Falk, Deputy Chief Counsel,

Office of Chief Counsel, and Shari Suzuki, FOIA Appeals Officer and Chief of FOIA Appeals,

Policy and Litigation Branch, including two *Vaughn* Indices.[5]  Customs also attached the

declarations of Joseph Reese, Director, Trade Agreements and Communications for the Office of

International Trade, U.S. Customs and Border Protection and Glenyss B. Ford, Assistant Field

Director, Office of Regulatory Audit with U.S. Customs and Border Protection in Detroit. [6]  In

its Reply brief, where appropriate, Customs, has via attached supplemental declarations,

---

[4] During the time between the September 29, 2006, filing of Custom's motion to dismiss
Counts II and III of the Complaint, and the status conference on July 16, 2007, the parties
engaged in settlement negotiations that ultimately led to the voluntary dismissal of Counts II and
III of the Complaint.

[5] Customs has revised the *Vaughn* indexes only to include the dates on documents and
attached the document to its Reply brief (Dkt. #38, Ex. 8).

[6] In the declarations, Customs has identified documents the office of Chief Counsel and
the FOIA Appeals Office determined would not be produced to Ford or described in a *Vaughn*
index because the documents were not responsive to Ford's request, as narrowed by Customs: (I)
three boxes, including paper files and fifty-three (53) floppy disks, from Customs' RAD in
Detroit; (ii) one large folder of paper records and one compact disk containing fifty-six (56)
"files" from Customs' RAD in Fort Mitchell, Kentucky, and Washington, D.C.; (iii) and 1,212
pages of records from Customs' Office of Chief Counsel ("OCC") in Washington, D.C. and
other "unresponsive" documents.

addressed concerns raised by Ford in its Response brief to the present motion (Dkt. #38, Ex. 5,

Supplemental Declaration of Joseph Rees ("Supp. Rees Decl."); Ex. 6, Supplemental Declaration

of Shari Suzuki ("Supp. Suzuki Decl."); and Ex. 7, Supplemental Declaration of Scott Falk

("Supp. Falk Decl.").

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party

demonstrates there is no genuine issue as to any material fact.  The Supreme Court has

interpreted this to mean that summary judgment should be entered if the evidence is such that a

reasonable jury could find only for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).  The moving party has "the burden of showing the absence of a genuine issue

as to any material fact."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Lenz*

*v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985).  In resolving a summary judgment motion, the

Court must view the evidence in the light most favorable to the non-moving party.  *See Duchon*

*v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711

F.2d 1319 (6th Cir. 1983).  But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that party's
> case, and on which that party will bear the burden of proof at trial.  In such a
> situation, there can be "no genuine issue as to any material fact," since a complete
> failure of proof concerning an essential element of the non-moving party's case
> necessarily renders all other facts immaterial.  The moving party is "entitled to a

judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### 1. *Rule 56 Summary Judgment Standard and FOIA*

Summary judgment is the procedural vehicle by which nearly all FOIA cases are resolved, and is proper where the pleadings and evidence on file show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Rugiero v. DOJ*, 257 F.3d 534, 544 (6th Cir. 2001); Fed. R. Civ. P. 56(c). Agencies typically establish that their obligations under Rule 56 and the FOIA have been met through a *Vaughn* index and supporting detailed affidavits or declarations. *Rugiero*, 257 F.3d at 544. A *Vaughn* index is a routine device through which the agency describes the documents responsive to a FOIA request and indicates the reasons for redactions or withholdings in sufficient detail to allow a court to make an independent assessment of the claims for exemptions from disclosure under the Act. *Id.* If the Government fairly describes the content of the material withheld and adequately states its grounds for non-disclosure, and if those grounds are reasonable and consistent with the applicable law, courts should uphold the Government's position. *Id.*

Ford has devoted the majority of its response to Customs' Motion for Summary Judgment to arguing that it is entitled to discovery. Relying on a non-FOIA case, Plaintiff

argues

that granting summary judgment in this case without allowing Plaintiff discovery would, *per se*, constitute an abuse of discretion. Yet, discovery is the exception, not the rule, in FOIA cases. *See, e.g., Wheeler v. CIA,* 217 F. Supp. 2d 132, 139 (D.D.C. 2003); *Judicial Watch, Inc. v. Export-Import Bank* 108 F. Supp. 2d 19, 25 (D.D.C. 2000). *See also Becker v. IRS,* 34 F.3d 398, 406 (7th Cir. 1994) (finding that district court did not err by granting summary judgment to government without addressing Plaintiff's motion for discovery in a FOIA case). "Discovery is to be sparingly granted in FOIA actions," and should be denied when the plaintiff's "efforts are made with [nothing] more than a bare hope of falling upon something that might impugn the affidavits" submitted by the defendant agency. *Pub. Citizen Health Research Group v. FDA,* 997 F. Supp. 56, 72 (D.D.C. 2000), *quoting, in part, Founding Church of Scientology v. NSA,* 610 F.2d 824, 836-37 n. 101 (D.C. Cir. 1979).

### 2. *The FOIA Statute*

The FOIA statute provides for disclosure of information to the public unless the requested records are exempt under one or more of the nine statutory exemptions. *Dep't of the Air Force v. Rose,* 425 U.S. 352, 360-361 (1976). The predominant objective of the FOIA is disclosure; however, the public's right to government information is not without limits. Section 552(b) delineates nine categories of information that are exempt from compelled disclosure. The exemptions are to be narrowly construed, and the burden is on the government to demonstrate that the materials sought may be withheld due to an exemption. *Rose,* 425 U.S. at 361; *Vaughn v. U.S.,* 936 F.2d 862, 866 (6th Cir. 1991). Federal courts review *de novo* an agency's decision to

withhold records.  5 U.S.C. § 552(a)(4)(B); *Detroit Free Press, Inc. v. DOJ*, 73 F.3d 93, 95 (6th Cir. 1996).

### 3. *The Vaughn Index*

A *Vaughn* index is an itemized index, correlating each withheld document (or portion) with a specific FOIA exemption and the relevant part of the agency's nondisclosure justification. *Vaughn*, 484 F.2d at 827; *Rugiero*, 257 F.3d at 544.  The index thus provides the court with "access to sufficient data" to evaluate the validity of claimed exemptions.  *Osborn v. Internal Revenue Service*, 754 F.2d 195, 196 (6th Cir. 1985).

The declarations of Joseph Rees, Shari Suzuki, Glennys Ford, and Scott Falk, attached as Exhibits A-D to Customs' Motion for Summary Judgment (Dkt. #28), attest to the reasonableness of the search for, and review of, documents responsive to Ford's FOIA requests.[7] The Falk and Suzuki declarations also set forth the basis for the withholding or redacting of documents in this case.  The *Vaughn* indexes attached to those declarations itemize the withheld and redacted documents and correlating FOIA exemptions.  With regard to Ford's concern that the *Vaughn* indexes do not include dates, Customs has revised the *Vaughn* indexes only to include the dates on documents.  The revised indexes are attached as Exhibit 8 to Customs' Reply brief (Dkt. #38).  Customs argues that these declarations and *Vaughn* indexes demonstrate that the withheld and redacted portions of records in this case are exempt from disclosure under the FOIA pursuant to 5 U.S.C. §§ 552(b)(5), (b)(6), (b)(7)(c), and (b)(7)(E).

---

[7] The statements of Joseph Rees, Shari Suzuki and Scott Falk are further supplemented in declarations attached to Customs' Reply brief (Dkt. #38, Ex. 5, Supp. Rees Decl.; Ex. 6, Supp. Suzuki Decl. and; Ex. 7, Supp. Falk Decl.).

**B.** **Factual Analysis**

*1.* *The Search*

The FOIA requires that a request "reasonably describe" the documents sought. 5 U.S.C. § 552(a)(3)(A). "In response to a FOIA request, an agency must make a good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information." *Rugiero*, 257 F.3d at 547. The agency may discharge its burden of establishing the adequacy of its search by relying on affidavits or declarations providing reasonable detail of the scope of the search (*id.*). Here, Customs has provided Ford with several declarations detailing the search it undertook, including supplemental declarations attached to their Reply brief that address concerns raised by Ford in their Response to Customs' Motion for Summary Judgment (Dkt. #38, Ex. 5, Supp. Rees Decl.; Ex. 6, Supp. Suzuki Decl. and; Ex. 7, Supp. Falk Decl.). Together with the declarations attached to Defendant's summary judgment motion, these supplemental declarations leave no substantial doubt regarding whether Customs' search was adequate. *See Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

Contrary to Ford's suggestion, it is not necessary that the agency employee who actually performed the search supply an affidavit describing the search; rather, the affidavit of an official responsible for supervising or coordinating the search efforts is sufficient in a FOIA litigation case to fulfill the "personal knowledge" requirement of Fed. Rule Civ. P. 56(e). *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 814 (2d Cir. 1994) ("There is no basis in either the statute or the relevant case law to require that an agency effectively establish by a series of sworn affidavits a 'chain of custody' over its search process. The format of the proof submitted by defendant –

declarations of supervisory employees, signed under penalty of perjury – is sufficient for purposes of both the statute and Fed. R. Civ. P. 56."); *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993). Although not required to do so, Customs provided two declarations (i.e., the declarations of Joseph Rees and Glenyss B. Ford) beyond those from the two officials supervising the searches in this case (i.e., the declarations of Scott Falk and Shari Suzuki) in order to provide a more complete picture of the searches conducted. Again, however, contrary to Ford's suggestion, Customs is not now required to provide a declaration from everyone who was involved in the processing of Ford's FOIA requests.

Counsel for Ford further avers that the delay in completion of the responses to Ford's FOIA requests "eviscerates any presumption of good faith owing to [Customs]" (Dkt. #34, Casino Affidavit at ¶ 7). While Customs' response to Ford's FOIA requests was not timely, "a lack of timeliness does not preclude summary judgment for an agency in a FOIA case." *Hornbostel v. U.S. Dep't of the Interior*, 305 F. Supp. 2d 21, 28 (D.D.C. 2003). Further, "[m]ere allegations that the government is shielding or destroying documents does not undermine the adequacy . . . of the search." *Kucernak v. FBI*, 1997 WL 697377, at *1 (9th Cir. Nov. 4, 1997); see also *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 67 n. 13 (D.C. Cir. 1990) ("[H]ypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of the agency's search").

Reasonableness is the standard by which a search in response to a FOIA request is measured. *Rugiero*, 257 F.3d at 547. The fundamental question is not "whether there might exist any other documents possibly responsive to the request, but rather whether the search for

those documents was adequate." *Steinberg v. U.S. Dep't of Justice*, 23 F. 3d 548, 551 (D.C. Cir. 1994).[8] *See also Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) ("Perfection is not the standard by which the reasonableness of a FOIA search is measured."). Further, the adequacy of any FOIA search is necessarily "dependent upon the circumstances of the case." *Davis v. Dep't of Justice*, 460 F.3d 92, 103 (D.C. Cir. 2006).

Here, Ford requested, among other things, "*All* documents from January 2001 to the present that *in any way* relate to an assessment of *or otherwise comment* on the nature or quality of Ford's relationship with CBP or Ford's compliance with Customs laws and/or regulations,"

---

[8] A belief that certain documents must be in Customs' possession, (Dkt. #33, Vandevert Decl.), is insufficient to warrant discovery where Defendant has provided declarations attesting to reasonable searches for such documents that failed to uncover any. *See, e.g., Flowers v. IRS*, 307 F. Supp. 2d 60, 67 (D.D.C. 2004) (stating that "purely speculative claims about the existence and discoverability of other documents" are not enough to rebut presumption of good faith); *Bay Area Lawyers for Nuclear Arms Control v. Dep't of State*, 818 F. Supp. 1291, 1295 (N.D. Cal. 1992) ("Plaintiff's incredulity at the fact that no responsive documents were uncovered . . . does not constitute evidence of unreasonableness or bad faith."). For example, Ford's counsel avers that he is "certain" that notes and other records related to an "informal forum" attended by Customs' employees Russell Ugone and Dathrenal Davis in 2002 exist and are being withheld (Dkt. #33, Vandevert Decl. at ¶¶ 46-47, 53). Yet, both Mr. Ugone and Ms. Davis (as well as Andrew Maner, who was identified in the original FOIA request) were asked to search for such documents and responded that they did not have any (Dkt. #28, Ex. 1, Rees Decl. at ¶¶ 14-15). The absence of records regarding an "informal forum" that took place six years ago should not be surprising.

With regard to Ford's assertions that Customs has failed to disclose Ford's compliance measurement reports, (Dkt. #33, Vandevert Decl. at ¶¶ 88-96), such reports are not always retained by Customs personnel because they can be recreated at any time from raw data via a computer program. FOIA does not require that an agency create documents in response to a FOIA request. *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980) ("The Act does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained."). In addition, Customs has provide a declaration from Dathrenal Davis, the Customs employee who handles Ford's importer account, regarding Ford's compliance measurement reports (Dkt. #39, Davis Decl.).

(Complaint at Exs. A-D) (emphasis added); "*Any* documents from February 2002 to the present that relate *in any way* to the review of Ford's application to join the Importer Self-Assessment (ISA) Program," (Complaint at Exs. A-C) (emphasis added); and "*Any documents relating in any way* to CBP's classification of Ford as a "low risk importer" during its 1997-2000 Customs Assessment Team ("CAT") Audit" (Complaint at Ex. D) (emphasis added). Not only is the universe of documents potentially responsive to such requests extremely large, the documents would not be in a single file or even necessarily at a single location. Nonetheless, as set forth in the Falk and Suzuki declarations, Customs conducted a reasonable, good-faith search, going beyond the specific locations to which Ford's FOIA requests were sent, to locate and identify documents responsive to those requests.[9]

For example, in its FOIA request to RAD, Headquarters, Ford requested, among other things, "[a]ny documents relating in any way to CBP's classification of Ford as a "low-risk importer" during its 1997-2000 Customs Assessment Team ("CAT") Audit (Complaint at Ex. D). Although no FOIA request was received at the RAD, Detroit, Joseph Rees, who coordinated the initial search for potentially responsive documents, contacted RAD, Detroit to request that it conduct a search for responsive documents because he knew that was where the audit was conducted (Dkt. #28, Ex. 1, Rees Decl. at ¶ 12). Also, when Customs was made aware of

---

[9]  Because under the FOIA a government agency is required to search only for records under its control, and is not required to contact former employees regarding FOIA requests, *Blanton v. U.S. Dep't of Justice*, 182 F. Supp. 2d 81, 85 (D.D.C. 2001), *aff'd* 64 F. App'x 787 (D.C. Cir. 2003)(*per curiam*), former Commissioner Bonner's former office at Customs was searched for documents responsive to Ford's FOIA request, but he was not contacted personally (Dkt #38, Ex. 6, Supp. Suzuki Decl. at ¶ 8).

potentially responsive records kept in the Penalties Branch of the Office of Regulations and Rulings (OR&R), it conducted a review of those documents (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 26).

Ford's letter to RAD Headquarters states that a similar FOIA request also was being filed with the RADs in Detroit and Fort Mitchell, Kentucky (Complaint at Ex D). Yet, RAD, Detroit never received such a FOIA request, and Ford does not allege in this lawsuit that it sent one there. Rather, Mr. Casino asks in his declaration why "the "Office of Chief Counsel searched only its Headquarter's office in Washington, D.C. [which was the only Office of Chief Counsel to which a FOIA request was sent] when it knew other Office of Chief Counsel's offices including Chicago and Detroit had responsive documents" (Dkt. #34, Casino Aff. at ¶ 11, question 33). It is not clear why, when Ford was seeking records related to an audit that took place in Detroit, it did not make that request directly to RAD, Detroit.

Further, FOIA requests must be made in accordance with the agency's published FOIA regulations. 5 U.S.C. § 552(a)(3)(A). Customs' regulations require that FOIA requests for documents located at field offices be sent to the appropriate field office. 19 C.F.R. § 103.5(d). Ford could have sent FOIA requests to the Detroit or Chicago Chief Counsel field offices, but did not. There is no need for Customs to explain why it did not search those offices. *See Church of Scientology v. IRS*, 792 F.2d 146, 150 (D.C. Cir. 1986) (finding that when agency regulations require requests to be made to specific offices for specific records, there is no need to search additional offices when those regulations are not followed); *Ray v. FBI*, 441 F. Supp. 2d 27, 32 (D.D.C. 2006) (stating that the "FBI is not obligated to undertake a search of its field offices'

records when a requester submits his request only to its headquarters"), *citing Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

Plaintiff requested "*[a]ll documents* from January 2001 to the present that *in any way relate* to an assessment of or *otherwise comment* on the nature or quality of Ford's relationship with CBP or Ford's compliance with Customs law and/or regulations." *Id.* (emphasis added). Customs repeatedly requested that Ford clarify or narrow the scope of this request, as it arguably would include, among other documents, litigation-related and publicly available documents that existed in Customs offices across the country that had been copied to the Office of Chief Counsel (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 22; Ex. 4, Falk Dec. at ¶¶ 10, 11, 14); *Rugiero*, 257 F.3d at 544 ("The FOIA requires that a request 'reasonably describe' the documents sought. 5 U.S.C. § 552(a)(3)(A). Accordingly, a request to narrow the scope of a search is entirely permissible under the Act."); see also *Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp.2d 19, 27 (D.D.C. 2000), quoting *Assassination Archives & Research Ctr. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989)("it is the requester's responsibility to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome . . . [because the] FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters.").

When Ford refused to narrow or provide any further clarification of this broad request, Customs reconsidered the request and determined that it reasonably could be interpreted as requesting internal agency communications assessing or commenting on the nature or quality of Ford's relationship with Customs from January 2001 to the processing of the FOIA request, and

internal agency communications assessing or commenting on Ford's compliance with customs laws and regulations from January 2001 to the processing of the FOIA request (Dkt. #28, Ex. 4, Falk Decl. at ¶ 15; Ex. 2, Suzuki Decl. at ¶¶ 22, 24). Customs informed Plaintiff of its interpretation and adjusted its search accordingly (Dkt. #28, Ex. 4, Falk Dec. at ¶ 16 and Ex. H). Ford did not object to or contest Customs' narrowed interpretation (*id.*).

Customs conducted a search of the 1997-2000 CAT audit documents for any documents relating to Customs' classification of Ford as a "low-risk importer." (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 19).[10] During the telephonic hearing on January 10, 2008, Ford suggested that in requesting "[a]ny documents relating in any way to CBP's classification of Ford as a "low-risk importer" during its 1997-2000 Customs Assessment Team ("CAT") Audit," it actually was requesting all of the 1997-2000 CAT audit documents, because one of the determinations made as a result of such an audit is whether an importer will be designated as "low-risk." Customs argues that Ford's suggested interpretation is implausible and unreasonable. Here, Ford did not ask for all documents related to the 1997-2000 CAT audit. Rather, Ford limited its request to a specific subset of records: those relating to Customs' classification of Ford as a "low-risk

_____

[10] The Casino Affidavit materially mis-characterizes the "low-risk importer" FOIA request at issue (Dkt. #34, Casino Aff. at ¶ 11, question 11). The request made to Customs was for "[a]ny documents relating in any way to CBP's classification of Ford as a "low-risk importer" during its 1997-2000 Customs Assessment Team ("CAT") Audit," not, as set forth in the Casino Affidavit, for "'any documents related in any way' to the CAT Assessment." Further, in questions 3 and 43, Mr. Casino appears to be conflating two different document requests: (1) the request for "low-risk importer" records related to the 1997-2000 CAT audit, and (2) the request for all records after January 2001 that comment on Ford's relationship with Customs and compliance with Customs laws and regulations. Customs sought narrowing only of the second of the two.

importer." If, as Ford now appears to assert, it actually was requesting all of the CAT audit records, it would have no reason to categorically limit that request by specifically referencing only documents related to "low-risk importer" status.[11] Further, as the 2000 CAT audit report makes clear, not all of the documents related to the audit militated in favor of Ford receiving "low-risk importer" status (Complaint, Ex. E at pp. 16-17).

Ford claims that it is entitled to discovery regarding records that were not deemed responsive by Customs and so were not released or identified in the *Vaughn* indexes. This claim is premised on Ford's theory that FAPL personnel reinterpreted FOIA requests already interpreted by personnel at RAD-Fort Mitchell, RAD-Detroit, and RAD-Washington, D.C., and reclassified documents that had already been determined to be responsive as non-responsive. Ford relies on *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 310 F. Supp. 2d 271 (D.D.C. 2004) in support of its claim that a "reclassification" of documents by FAPL "invalidates" FAPL's review of the documents.

The situation in the *Judicial Watch* case is distinguishable from the facts of this case.

_____

[11] In this regard, the present case differs from *LaCedra v. EOUSA*, 317 F.3d 345, 348 (D.C. Cir. 2003), where the FOIA requester sought "all documents pertaining to my case that was prosecuted by your office," and then expressed a "heightened interest" in certain documents by stating, "[s]pecifically I am requesting the following below." *Id.* Here, Ford did not preface its request for "low-risk importer" related documents with a request for all the CAT audit documents.

Customs further notes that in May 2007, during discovery in *United States of America v. Ford Motor Co.*, No. 06-CA-0013 (W.D. Texas), Ford made such an inclusive request for the "entire [1997-2000] Compliance Assessment Audit file, including, but not limited to, work papers, preliminary and draft documents . . . and memoranda . . . ." In response to that request, Ford received 1659 pages of documents and a privilege log identifying 562 documents, many of which were multiple pages, that were withheld under the deliberative process privilege.

In *Judicial Watch*, after the Department of Energy had filed its motion for summary judgment and *Vaughn* index, it reclassified as unresponsive documents that were previously deemed responsive, as evidenced by their placement in the *Vaughn* index. The court noted that the agency's declaration failed to explain why the documents had been "reclassified," and that no new *Vaughn* index had been provided. *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 310 F. Supp. 2d at 327. Here, no "reclassification" occurred (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 19). Customs avers that after review by FAPL all of the documents that were deemed responsive were disclosed or are accounted for in the *Vaughn* indexes. Even if such were not the case, however, Ford points to nothing to support its claim that such a "reclassification" on administrative appeal, prior to the final agency decision on disclosure and prior to preparation of the *Vaughn* indexes would somehow "invalidate" the decision. Indeed, FAPL's role is that of reviewer.

The review for responsiveness was conducted by FAPL because when the various Customs offices did not timely respond to the initial FOIA requests, Ford filed an administrative appeal with FAPL. When the delay in response continued, FAPL took over the processing of the RAD requests in order to expedite the process (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 16). Ford points to no authority that precludes FAPL from exercising its discretion in this manner (*id.* at ¶ 8). Likewise, there is nothing suspect about the involvement of the Office of Chief Counsel, which is outlined in the declarations of Scott Falk.[12]

_____

[12] FAPL's interpretation of Ford's request for any documents relating to Customs' classification of Ford as a "low-risk importer" was made independently of the Office of Chief Counsel (Dkt. #38, Ex. 7, Supp. Falk Decl. at ¶ 9). Ford does not explain why its interpretation

Accordingly, Ford's request for discovery should be denied because it has failed to provide "concrete evidence of bad faith" and has not raised any substantial questions regarding the substantive content of Customs' declarations. *See Kay v. FCC*, 976 F. Supp. 23, 34 n. 35 (D.D.C. 1997) (concluding that because plaintiff failed to submit "concrete evidence of bad faith," discovery was actually sought only to discredit agency declaration), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998) (unpublished table decision); see also *Military Audit Project v. Casey*, 656 F.2d 724, 751 (D.C. Cir. 1981) (affirming trial court's refusal to permit discovery when plaintiffs had failed to raise "substantial questions concerning the substantive content of the [defendants'] affidavits"). Here, Customs made a good faith effort to work with Ford to clarify its FOIA request. When that effort failed, largely due to Ford's failure to cooperate, Customs made a reasonable interpretation of Ford's broad request and provided relevant documents. It is therefore **RECOMMENDED** that Customs be granted summary judgment as to the adequacy of its search and that Plaintiff be denied discovery.

## 2. *Withholdings and the Adequacy of the Vaughn Indexes*

In order to assess the nature of the documents withheld and the propriety of the claimed exemptions, a plaintiff in a FOIA action is entitled to an index of documents and portions of documents withheld by the defendant agency, which is known as a *Vaughn* Index. *See Osborn v.*

---

of the "low-risk importer" request (that it encompassed all of the 1997-2000 CAT audit records) should be accepted over Customs, but simply asserts that it is entitled to discovery on the matter because it believes Customs is improperly hiding documents. Yet, as explained above, Ford knows what constitutes the universe of the 1997-2000 CAT Audit documents because it received many of those records during discovery in *United States of America v. Ford Motor Co.*, No. 06-CA-0013 (W.D. Texas), as well as a privilege log identifying and describing the documents withheld pursuant to privilege.

*IRS*, 754 F.2d 195, 196 (6th Cir. 1985) (adopting *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974)).

When an agency withholds information responsive to a FOIA request, the agency bears the burden of proving the withholding is justified. *Schell v. HHS*, 843 F.2d 933, 937 (6th Cir. 1988). To meet its burden, the agency must adequately describe the withheld information and provide a detailed analysis of the reasons for its withholdings or redactions. *See Rugiero*, 257 F.3d at 544 and 552. The Court "must have sufficiently detailed information regarding the contents of withheld documents along with reasoning for the application of specific FOIA exemptions to enable the court to make an independent assessment of both the contents of the documents in issue and the applicability of any asserted exemption(s)." *Vaughn*, 936 F.2d at 869; see also *Osborn*, 484 F.2d at 196. Conclusory affidavits and declarations are insufficient to carry the government's burden of proof in justifying withholdings. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980).

Ford argues that Customs' *Vaughn* indexes are inadequate because the descriptions of documents and application of exemptions are not sufficiently detailed.[13] Ford further objects to

---

[13] In *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 310 F. Supp. 2d 271 (D.D.C. 2004), a case otherwise relied on by Ford in this matter, the court explicitly approved of the combined use of declarations and *Vaughn* indexes to justify withholdings under FOIA exemptions. The court explained that "[i]t is not necessary to provide an individual justification for each document, when doing so would either require 'phony individualization' of documents for which the same explanation applies or would require the agency to explain in such detail that the *Vaughn* index itself would reveal the information that the agency is attempting to withhold." *Id.* at 309, *citing Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987) ("[I]t is the function, not the form, of the index that is important."). *See also Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d at 34 (finding that a categorical indexing technique satisfied the requirements for a *Vaughn* index).

Customs' description in declarations of the bases for various categories of exemptions, and its abbreviated application of those exemptions to particular documents.

Before discussing each exemption claimed, it should be noted that Customs has agreed to further review certain documents and update their *Vaughn* indexes. After considering Ford's inquiries regarding the review of documents provided to FAPL by the RAD-Fort Mitchell office, FAPL has decided to review again the ISA related documents provided by that office for responsiveness and possible release or placement in the *Vaughn* index, using a broader interpretation than used initially (Dkt #38, Ex. 6, Supp. Suzuki Decl. at ¶ 10). As soon as possible after that review, Customs has indicated it will produce the documents that may be released and identify any responsive documents that have been withheld (*id.*). With regard to Ford's concern that the *Vaughn* index does not include dates, Customs has revised the *Vaughn* indexes to include the dates on documents. The revised indexes are attached as Exhibit 8 to Customs' Reply brief (Dkt. #38, Ex. 8).

Customs' decision to release additional documents, however, does not by itself call into question the adequacy of Customs' declarations or justify the need for discovery. "An agency's disclosure of documents that it has previously withheld does not render its declarations suspect. *See Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986); *Military Audit Project v. Casey*, 656 F.2d 724, 754 (D.C. Cir. 1981). Were the Court to 'punish flexibility' in this manner, it would imply that a 'forthcoming agency is less to be trusted in its allegations than an unyielding agency.'" *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 310 F. Supp. 2d at 307.

     **a.**     **<u>FOIA Exemption(b)(5)</u>**

Exemption (b)(5) of the FOIA exempts from mandatory disclosure "inter-agency or intraagency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." As such, it has been construed to exempt documents normally privileged in the civil discovery context. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). The Supreme Court has further noted that "the FOIA was not intended to supplement or displace rules of discovery." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989). *See also United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799-800 (1984); *Schell v. HHS*, 843 F.2d 933, 939 (6th Cir. 1988). "Exemption 5 has been interpreted as preserving to the agencies such recognized evidentiary privileges as the attorney-client privilege, the attorney work-product privilege, and the executive 'deliberative process' privilege" *(id.)*. In this case, documents responsive to Ford's FOIA requests were withheld pursuant to the (b)(5) exemption under the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 36; Ex. 4, Falk Decl. at ¶ 25).

### i.    *Exemption (b)(5) and the Deliberative Process Privilege*

The deliberative process privilege protects the decision-making processes of government agencies. *Sears*, 421 U.S at 150.

> The primary purpose served by the deliberative process privilege is to encourage candid communications between subordinates and superiors.

>> [I]t serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by

> dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reason for the agency's action. . . .

> The ultimate goal that Exemption 5 seeks to achieve is to prevent the quality of agency decision-making from deteriorating as a result of public disclosure.

*Schell*, 843 F.2d at 939 (citation omitted).

In order to be exempt from mandatory disclosure under the deliberative process privilege, the communication must be both pre-decisional and deliberative. *Id*. at 940, 942. Documents commonly encompassed by the privilege include recommendations, draft documents, proposals, suggestions, and other advisory opinions, and deliberations comprising part of a process by which subjective documents reflect the personal opinions of the writer rather than the policy of the agency, the release of which would likely stifle honest and frank communication within the agency. *Id.* at 940.

In this case, Customs argues that intra-agency memoranda and other intra-agency communications, as well as draft documents, were properly withheld or redacted pursuant to Exemption (b)(5) because they reveal Customs' decision making process with regard to Ford's admission to the ISA, as well as strategies in various litigation with Ford, and their release would tend to stifle communication in such decision-making within the agency (Dkt. #28, Ex. 2, Suzuki Decl. at ¶ 44; Ex. 4, Falk Decl. at ¶ 35). Disclosure of such information would negatively affect the willingness of employees to document personal opinions and suggestions and deter them from organizing their thoughts on initial plans of action because of the apprehension that such information could be made public.

As the Sixth Circuit has recognized, these are the kind of candid documents expressing personal views which, if disclosed, would likely "'stifle honest and frank communication within the agency.'" *Schell*, 843 F.3d at 940-941. "'Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process.'" *Id.* at 941 (quoting *U.S. v. Nixon*, 418 U.S. 683, 705 (1974)). Thus, Customs argues that like the content of the memorandum that was properly withheld in *Schell*, the pre-decisional personal views of the agency officials in this case "would not have been so forthcoming had they known the [documents] would have reached public attention." *Id.*

Customs' *Vaughn* Indexes, however, do not provide adequate detail regarding the withheld documents in order for the Court to make an informed decision about whether application of the deliberative process privilege is appropriate. The *Vaughn* Indexes instead list only the document number, document location, a brief document description, the number of pages in the document, and a mere assertion of exemption privileges. It does not contain substantive reasoning and analysis explaining why the deliberative process privilege applies to each of the documents. As an example of the amount of detail required, Ford points to past litigation been itself and Customs in which a Custom's official provided a declaration containing the necessary specificity with respect to claims of privilege. *See* Declaration of Deborah Spiro, dated May 24, 2007, from *U.S. v. Ford Motor Co.*, No. 3:06-CV-00013, U.S. District Court for the Western District of Texas, El Paso Div., a true copy of which is attached as Exhibit C to Ford's Response brief (Dkt. #35, Ex. C). This declaration devotes extensive paragraphs to each

document withheld identifying the date of each document, the persons involved, and a detailed reason for the withholding.

By contrast, based on what Customs has provided herein, neither Ford nor this Court can make a determination regarding whether the deliberative process privilege properly applies to the withheld documents. Where, as here, "the descriptions for many of the documents are too cursory to permit debate, or an informed judgment, about whether they properly may be withheld," the *Vaughn* Index is insufficient. *Church of Scientology Int'l v. U.S. Dept. of Justice*, 30 F.3d 224, 230 (1st Cir. 1994).

Ford argues that a related deficiency of the applicable *Vaughn* indexes are there failure to provide a reasonable segregability analysis. If a documentary record contains some information that is exempt from disclosure, "any reasonably segregable information must be released after deleting the exempt portions, unless the nonexempt portions are inextricably intertwined with the exempt portions." *Anderson v. U.S. Dept. of Justice*, 518 F.Supp.2d 1, 14 (D.D.C. 2007); *Electronic Privacy Information Center v. U.S. Dep't. of Justice*, 511 F.Supp.2d 56 (D.D.C. 2007). The segregability requirement applies to all documents subject to FOIA and all exemptions in FOIA. *Electronic Privacy*, at 65. "It is the agency's burden to prove that the withheld portions are not segregable from the non-exempt material." *Davin v. U.S. Dept. of Justice*, 60 F.3d 1043, 1052 (3d Cir. 1995) (finding declaration insufficient where it did not adequately describe the process by which the agency determined that all reasonably segregable material of each of the withheld documents had been released and did not provide a factual recitation of why certain materials were not reasonably segregable).

A *Vaughn* Index should contain a description of its segregability analysis, explaining "in detail which portions of each document are disclosable and which are allegedly exempt." *Vaughn*, 484 F.2d at 827. Yet, no segregability analysis is required where a document is withheld in full pursuant to the attorney work product doctrine, under which a large number of the documents in this case were withheld. *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 432 F.3d 366, 371-372 (D.C. Cir. 2005) (rejecting district court's ruling that the government was required to disclose any reasonably segregable portion of documents withheld under the attorney work-product doctrine and stating that deliberative process privilege and attorney work-product doctrine "are not coterminous in their sweep." "[F]actual material is itself privileged when it appears within documents that are attorney work product. If a document is fully protected as work product, then segregability is not required.").

Here, a number of *Vaughn* Index entries reference material which may be able to be segregated and produced by Customs. Yet, Customs has provided no such non-conclusory segregability analysis, or sufficiently explained why certain documents should be withheld in full, thereby eliminating the requirement for a segreability analysis. Neither the Court nor Ford should be left to trust Customs' assertions that segregability is impossible with nearly all of its documents. *See Auto Alliance Int'l inc. v. US Customs Service*, 300 F. Supp.2d 509 (E.D. Mich. 2004). As a result, disposition of the underlying adequacy of Customs' response to the FOIA request remains impossible without further refinement of the existing *Vaughn* indexes.

Customs has not met its burden of demonstrating that the documents contained in its *Vaughn* Indexes meet the pre-decisional and deliberative requirements necessary to qualify

under FOIA's Exemption (b)(5) deliberative process privilege. "[T]he key issue in applying this exception is whether disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions." *Rugiero*, 257 F.3d at 550 (citations and internal punctuation omitted); see also *Ethyl Corp. v. U.S. Envtl. Prot. Agency*, 25 F.3d 1241, 1248 (4th Cir. 1994) ("the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment"); *Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (stating that the privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"). An agency report – not described in any way as a draft or the personal opinion of an individual within Customs – would not betray Customs' internal decision-making process.

Courts have held that the scope of Exemption 5 is meant to be narrowly construed in furtherance of the purpose of FOIA, which is to allow the public to know what its government is doing and why. As such, "the exemption is to be applied as narrowly as consistent with efficient Government operation." *Coastal States Gas Corp.*, 617 F.2d at 868 (quoting S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)). Thus, when a government agency invokes the deliberative process privilege, the burden is upon the agency to demonstrate that it meets the requirements, a communication must be both pre-decisional and deliberative, for withholding information from the public. *Id.* at 861, 866.

In this case, Customs invokes the deliberative process privilege in several respects without sufficient detail explaining the reason for applying the privilege. For instance, Customs does not identify with respect to any of its claimed pre-decisional documents to what decision it is related. Nor are the persons who coauthored or reviewed the documents identified. This is crucial information required to evaluate Customs' claims.

Customs also cannot demonstrate that documents containing purely factual information should be subject to the deliberative process privilege. *Judicial Watch, Inc. v. U.S. Dep't of Health and Human Services*, 27 F. Supp.2d 240, 245 (D.D.C. 1998) (stating that the deliberative process privilege does not protect purely factual material that does not reveal an agency's deliberations); see also *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Bilbrey v. U.S. Dep't of the Air Force*, 2001 WL 1222471, at *1 (8th Cir. 2001). As an example, the ISA Applicant Information, document ORR 35-36, likely contains purely factual information, and accordingly should not be shielded by the deliberative process privilege. Even in situations where there is commingled factual material and deliberative process material, an agency may still be compelled to produce the factual material. *See Resident Advisory Bd. v. Rizzo*, 97 F.R.D. 749, 753-54 (E.D. Pa. 1983); *Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, n. 6 (N.D.N.Y. 1983). Where purely factual information is found in a withheld document, the document should be released, in whole or part, as it is not protected under the deliberative process privilege.

As a result, Customs cannot withhold documents simply because they contain or express an opinion, since that alone is not enough to fit within the relevant exemption. *Petroleum Information Corp.*, 976 F.2d at 1435. Indeed "when material could not reasonably be said to

reveal an agency's or officials mode of formulation or exercising policy-implicating judgment, the deliberate process privilege is inapplicable." *Id.*

Next, Customs must meet its burden with regard to summary documents which communicate agency decisions which have already been made, as such documents are not pre-decisional nor are they deliberative. *See Judicial Watch, Inc. v. HHS*, at 245; *Judicial Watch, Inc. v. Dep't of Army*, 435 F. Supp. 2d 81, 90 (D.D.C. 2006) (finding that a cover sheet and materials containing "opinions and recommendations" which served as an update on the current status of an agency decision were not predecisional nor were they deliberative). Even documents which may have been predecisional at the time they were prepared can lose that status if they are adopted, formally or informally, as the agency position on an issue or if they are used by the agency in its dealings with the public. *Coastal States*, 617 F.2d at 866; *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975); *Afshar v. Dep't of State*, 702 F.2d 1125,

1142-43 (D.C. Cir. 1983).

In its opposition brief, Ford identifies ORR 50-55 as a "summary document" from which it claims information has been improperly withheld under the deliberative process privilege. (Dkt. #35, p. 15). Ford claims that the "document references an already arrived at recommendation," and so cannot be pre-decisional or deliberative (*id.*). Yet, the *Vaughn* index entry for ORR 50-55 makes clear that the redacted portion includes a recommendation by only one segment of Customs (the ISA team) that is participating in the ISA decision making process, and that the team is providing the recommendation to "assist decision-makers to determine if

Ford should be allowed into the ISA."[14]  Such information is pre-decisional and deliberative.

When feasible, as is usually the case, the decision to which the document relates should be

identified.  If an agency makes policy recommendations to a higher non-agency decision maker,

that agency's documents may still qualify under exemption (b)(5).  This was the situation in

*Judicial Watch*, which explained, "[t]he applicability of the deliberative process privilege does

not turn 'on the ability of an agency to identify a specific decision in connection with which a

memorandum is prepared.'" *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 310 F. Supp. 2d at

312.  *See also People for the American Way Foundation v. National Park Service*, 503 F. Supp.

2d 284, 298 (D.D.C. 2007) ("A 'predecisional' determination is not affected by whether the

agency has subsequently made a final decision or simply decided not to make a final decision"),

*citing Fed. Open Mkt. v. Merrill*, 443 U.S. 340, 360 (1979).  Thus, while Customs must ensure it

has properly addressed "summary documents" in its *Vaughn* Indexes, the entry for ORR 50-55 is

deemed sufficient.

        In addition, discussions of how agency policies and decisions are to be enforced are by

nature post-decisional and therefore not subject to the exception.  The same is true of a

"downstream" memo, one in which instructions and justifications are sent from higher-level

officials to lower-level personnel about how to resolve certain issues.  Courts are more likely to

find "downstream" communications to be post-decisional and therefore outside the protection of

the deliberative process privilege.  *See Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir.

1983).  To allow protection for such documents would help create an impermissible agency

---

[14] The document as it was released to Ford is attached as Exhibit 9 (Dkt. #38, Ex. 9).

"secret law" consisting of "orders and interpretations which [the agency] actually applies to cases before it."  *Sterling Drug, Inc. v. Federal Trade Commission*, 450 F.2d 698, 708 (D.C. Cir. 1971); see also, *Safeway, Inc. v. Internal Revenue Service*, 2006 WL 3041079, at *9 (N.D. Cal. 2006) (ordering the release of documents characterized as "interagency discussion of how to apply established policy and law to particular facts of Plaintiff's audit"); *Coastal States*, 617 F.2d at 868. Such documents should be disclosed because they are not pre-decisional, but are discussions of how agency policy should be applied.

In light of the above, as the deliberative process privilege is meant to be narrowly construed and the burden is upon the agency to demonstrate how the privilege applies.  Customs has not met its burden in this circumstance.  In such a situation, courts can allow the responding entity a further opportunity to meet its burden of proof.  *See Voinche v. FBI*, 412 F. Supp. 2d 60, 65 (D.D.C. 2006), *citing Coleman v. FBI*, 1991 WL 333709, *1 (D.D.C. 1991) ("If the index is not sufficiently detailed to permit the Court to conduct a *de novo* review, the Court may then order the submission of a more detailed index").  Accordingly, within 30 days of acceptance or modification of this Report and Recommendation, Customs should review and update its *Vaughn* indexes in accordance with this Report and Recommendation, or turn the documents in question over to Ford.


### ii.        *Exemption (b)(5) and the Attorney-Client Privilege and Attorney Work Product*

*Privilege*

The attorney-client privilege is "the oldest of the privileges for confidential information known to the common law." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981). The Supreme Court has long recognized that the attorney-client privilege merits special protection "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* Thus, "if a party demonstrates that attorney-client privilege applies, the privilege affords all communications between attorney and client absolute and complete protection from disclosure." *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997). This privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390.

In this case, documents covered by (b)(5) under the attorney-client privilege are records of confidential communications between Customs employees and agency counsel concerning various litigation with Ford and Customs counsel's advice regarding Ford's application to the ISA program. The confidential communications include facts provided by Customs to counsel for the purpose of securing a legal opinion and assistance in the relevant decision-making. They contain, discuss, analyze, or refer to, information provided by various Customs entities, whether those communications were between Customs attorneys, between Customs attorneys and Customs entities, or between Customs attorneys and the U.S. Department of Justice or various U.S. Attorneys' Offices (Dkt. #28, Ex. 4, Falk Decl. at ¶¶ 27-29; Ex. 2, Suzuki Decl. at ¶¶

38-39).

The attorney work-product privilege protects documents and other memoranda prepared by an attorney in anticipation of foreseeable litigation. *Hickman v. Taylor*, 329 U.S. 495, 509-510 (1947); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C.Cir. 1980). The privilege also applies to cover documents prepared by an attorney that relate to possible settlements of litigation. *See Tax Analysts v. IRS*, 152 F. Supp.2d 1, 19 (D.D.C. 2001); *Cities Serv. Co. v. FTC*, 627 F. Supp. 827, 832 (D.D.C. 1984).

A document cannot be shielded, however, from disclosure pursuant to a FOIA request simply because it contains a communication involving agency or government counsel. *Judicial Watch, Inc. v. Dep't of Army*, 435 F. Supp.2d at 89; see also *Upjohn Co. v. United States*, 449 U.S. 383, 396 (1981). Rather, in order for a document to fall under an attorney-client privilege it must satisfy the following requirements. "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to the purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except [where] the protection be waived." *Fox v. Massey-Ferguson*, 172 F.R.D. 653, 669 (E.D. Mich.1995), *quoting United States v. Goldfarb*, 328 F.2d 280, 281 (6th Cir. 1964).

The mere fact that an individual is an attorney and is involved in "communications" does not automatically create a privileged document. "[T]he privilege only applies if the lawyer is providing legal advice or services, and will not protect disclosure of non-legal communications where the attorney acts as a business or economic advisor." *Id*. *quoting Hydraflow vs Enidine*,

37

*Inc.*, 145 F.R.D. 626, 630 (W.D.N.Y.1993). In the context of federal agency communications, where a counsel's opinion or recommendation is analogous to a final disposition that has operative and controlling effect over the decision-making process, such opinions must be disclosed. *See Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 617 (D.C. Cir. 1997) (finding advice memoranda issued by IRS Office of Chief Counsel were not pre-decisional documents because they were statements of the agency's legal position).

In this case, Customs contends the attorney-work product privilege was applied to documents created by or at the behest of attorneys and contain information regarding current and anticipated litigation with Ford, settlement negotiations and litigation strategies, and similar information (Dkt. #28, Ex. 2, Suzuki Decl. at ¶¶ 41-43; Ex. 4, Falk Decl. at ¶¶ 31-34). The privilege was also applied to communications between two or more Customs attorneys concerning litigation, settlement, and Ford's history with the agency in relation to litigation analyses, and other litigation related documents between Customs attorneys and the U.S. Department of Justice and various U.S. Attorneys' Offices (*id.*).

Here, the nature of the litigation or legal advice given is not clear from that the *Vaughn* indexes. Nor does Customs identify the author and recipients' names for each document. To retain attorney-client or work product privilege, it must be shown that each non-attorney was necessarily involved in the seeking, receipt or implementation of legal advice. E-mails are commonly circulated more broadly than needed for seeking, receiving or implementing legal advice under the attorney-client privilege. As discussed below in discussing exemption (b)(6), Customs is not required to provide the names and personal information of the individuals

involved. But for the (b)(5) exemptions some unique identifiers of each individual who received

a document (initials or other sufficient identifiers) and that individual's role is required, so that

Ford can determine if a document was more broadly circulated than allowed under a specific

privilege. Specifically, all individuals seeking, receiving or implementing the legal advice must

be assigned some identification and explanation of their role related to the legal matter. This

will allow Ford and this Court to gain a better understanding of whether the communication at

issue was related to litigation or legal matters or to management functions. Accordingly,

Customs should review and update its *Vaughn* indexes in accordance with this Report and

Recommendation.

### b. _FOIA Exemption (b)(6)_

Exemption (b)(6) permits the government to withhold all information about individuals in

"personnel and medical files and similar files" when the disclosure of such information "would

constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The

Supreme Court has held that Congress intended the term "similar files" to be interpreted broadly,

rather than narrowly. *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599-602 (1982).

The Court also made clear that all information that applies to a particular individual meets the

threshold requirement for Exemption 6 protection. *Id.* Thus, the exemption is equally applicable

to the "author" and the "subject" of a file. *New York Times Co. v. NASA*, 920 F.2d 1002,

1007-08 (D.C. Cir. 1990) (*en banc*). If the threshold requirement of Exemption 6 is met, and a

privacy interest exists, then the individual's right to personal privacy is balanced against the

public's interest in shedding light on the agency's performance of its statutory duties. *Rose*, 425

U.S. at 372; *Schell*, 843 F.2d at 938. If no public interest exists, the information should be

protected, as "something, even a modest privacy interest, outweighs nothing every time." *Nat'l*

*Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

With regard to establishing a privacy interest, the relevant inquiry is whether public

access to the information at issue would violate a viable privacy interest of the subject of such

information. *See Schell,* 843 F.2d at 938. The Supreme Court has stressed that "both the

common law and the literal understandings of privacy encompass the individual's control of

information concerning his or her person." *DOJ v. Reporters Committee for Freedom of the*

*Press*, 489 U.S. 749, 763 (1989). Further, information need not be intimate or embarrassing to

qualify for Exemption 6 protection. *See Washington Post Co.*, 456 U.S. at 600; *Horner*, 879

F.2d at 874-875.

The burden of establishing that disclosure would serve the public interest is on the

requester. *See Manna v. DOJ*, 51 F.3d 1158, 1166 (3rd Cir. 1995); *Carter v. U.S. Dep't of*

*Commerce*, 830 F.2d 388, 391 nn. 8 & 13 (D.C. Cir. 1987). The scope of public interest to be

considered is "the kind of public interest for which Congress enacted the FOIA." *Reporters*

*Committee*, 489 U. S. at 774. Further, disclosure must benefit the public overall and not just the

requester. *Id*. at 771-772 & n. 20. Thus, "unless the public would learn something directly about

the workings of the Government by knowing the names [that were withheld], their disclosure is

not affected with the public interest." *Horner*, 879 F.2d at 879.

Here, the names, initials and telephone numbers of agency officials and third-party

individuals were withheld under (b)(6) (Dkt. #28, Ex. 4, Falk Decl. at ¶ 42; Ex. 2, Suzuki Decl.

at ¶ 51).  Disclosure of this information would not add to the public's understanding of how an

agency works or how well it performs its duties.  Customs is aware of no public interest in

disclosure, and thus, the loss of privacy resulting from the release of the employees and third

parties' identifying information supports application of Exemption 6, as to do otherwise would

constitute a clearly unwarranted invasion of person privacy.  *See U.S. Dep't of the Navy*, 975

F.2d 348, 356 (7th Cir. 1992)(disclosure of names and telephone numbers of federal employees

constitutes a clearly unwarranted invasion of personal privacy under Exemption 6).

Ford has not provided a specific objection or other authority in their Response brief,

which directly addresses exemptions under (b)(6).  Nor has Ford presented an argument

identifying how the public's interest would be served through disclosure of the names of agency

officials and third party individuals withheld.  Accordingly, Customs does not have to disclose

personal information, but should ensure that the titles and/or other specific identifiers of each

individual connected to a *Vaughn* index entry be provided so that Ford can reasonably determine

whether to object to the withholding of a document under a separate exemption, such as

attorney-client privilege and attorney work product privilege.

### c.       *FOIA Exemption (b)(7)*

Exemption (b)(7) exempts records or information complied for law enforcement

purposes, and this circuit has adopted a *per se* rule under which any documents compiled by a

law enforcement agency fall within the first part of (b)(7).  *Rugiero*, 257 F.3d at 550.  "This rule

applies not only to criminal enforcement actions, but to records compiled for civil enforcement

purposes as well."  *Id.*  "Accordingly, for a law enforcement agency to withhold information

under this section, one of the specific provisions of section 552(b)(7) alone need apply." *Rugiero*, 257 F.3d at 550-551. The two subpart (b)(7) exemptions that are relevant here are (C) and (E).

### i.    FOIA Exemption (b)(7)(C)

Subsection 552(b)(7)(C) exempts from mandatory disclosure "records or information compiled for law enforcement purposes [that] could reasonably be expected to constitute an unwarranted invasion of personal privacy." Exemption 7(C), like Exemption 6, requires a balancing of the privacy interests at risk against the public interest, if any, that would be served by disclosure. *Rugiero*, 257 F.3d at 551. Although the language of 7(C) is similar to that of 6, "the standard for evaluating the threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files." *Reporters Committee*, 498 U.S. at 756.

In this case, the exemption has been applied to the names of government personnel and third parties who were involved in an investigation or to law enforcement personnel who were otherwise mentioned in the documents (Dkt. #28, Ex. 4, Falk Decl. at ¶ 46).

### ii.    FOIA Exemption (b)(7)(E)

FOIA Exemption 7(E) permits a federal agency to withhold materials that would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably

be expected to risk circumvention of the law.  *Jones v. FBI*, 41 F.3d 238, 249 (6th Cir. 1994).

Here, information was redacted under Exemption (b)(7)(E) that would reveal Customs' investigative techniques related to the monitoring of importation activities (Dkt. #28, Ex. 4, Falk Decl. at ¶¶ 50-51; Ex. 2, Suzuki Decl. at ¶ 55-56).  Disclosure of the redacted information would advise violators or potential violators of Customs law enforcement practices, procedures, and techniques, thereby enabling them to circumvent the law, avoid detection, and evade apprehension (*id.*).  In its Response, Ford does not challenge any documents that Customs withheld.

### 3.     *Conclusion*

Ford's request for discovery should be denied because it has failed to provide "concrete evidence of bad faith" on the part of Customs.  *See Kay v. FCC*, 976 F. Supp. 23, 34 n. 35 (D.D.C. 1997) (concluding that because plaintiff failed to submit "concrete evidence of bad faith," discovery was actually sought only to discredit agency declaration), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998) (unpublished table decision); see also *Military Audit Project v. Casey*, 656 F.2d 724, 751 (D.C. Cir. 1981) (affirming trial court's refusal to permit discovery when plaintiffs had failed to raise "substantial questions concerning the substantive content of the [defendants'] affidavits").  There remain substantial questions, however, regarding the sufficiency of entries in Customs' *Vaughn* indexes.  Rather than allowing discovery, IT IS RECOMMENDED that the Court direct Customs to provide a more detailed *Vaughn* index(es) and/or declarations consistent with this Report and Recommendation.  *Tamayo v. U.S. Dep't of Justice*, 2008 WL 413963, *2 (S.D. Fla. 2008) ("[E]ven if an agency's affidavits regarding its search are deficient, courts often do

not grant discovery but instead direct the agency to supplement its affidavits"), *citing Judicial Watch, Inc. v. U.S. Dep't of Justice*, 185 F. Supp. 2d 54, 65 (D.D.C. 2002).

Any documents that have been withheld for reasons inconsistent with this Report and Recommendation should be released to Ford within 30 days of adoption of this Report and Recommendation. Any documents which Customs continues to withhold should be listed on a supplemental *Vaughn* indexes with sufficient detail, as described above, to justify their withholding. These revised *Vaughn* indexes should also be provided to Ford within 30 days of adoption of this Report and Recommendation. In its opposition brief, Ford rarely identifies a specific entry in the *Vaughn* indexes to which it objects. After reviewing the revised *Vaughn* indexes, Ford shall communicate to Customs' counsel within 30 days of receipt of the revised *Vaughn* indexes those entries to which it specifically objects with detailed explanation. The parties shall then meet and confer to attempt to resolve any outstanding issues. If the parties are unable to resolve all of their issues, a status conference may be convened with this Court to address the remaining issues.

## III.    RECOMMENDATION

For the reasons indicated above, **IT IS RECOMMENDED** that Customs' motion be **GRANTED IN PART** and **DENIED IN PART**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d

505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Date: August 1, 2008                         s/Steven D. Pepe
Ann Arbor, Michigan                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Report and Recommendation** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 1, 2008.

                                             s/ Alissa Greer
                                             Case Manager to Magistrate
                                             Judge Steven D. Pepe
                                             (734) 741-2298